NIXON–EGLI EQUIPMENT CO.,
a California corporation,
Plaintiff,

v.

JOHN A. ALEXANDER CO., aka John A. Alexander Co., Inc., a California corporation, et al., Defendants.

No. CV 95–2269 SVW (JRx).

United States District Court,
C.D. California.

Aug. 13, 1996.

1436

Craig A. Moyer, Gregory D. Trimarche and Jennifer T. Taggart, Demetriou Del Guercio Springer & Moyer, Los Angeles, CA, for Nixon–Egli Equipment Co.

Edward J. Casey, Louis A. Karasik, Martha S. Doty, McClintock Weston Benshoof Rochefort Rubalcava & MacCuish, Los Angeles, CA, for John A. Alexander Co.

Michael D. Wade, Janice M. Byrne, Delmer Armstrong & Rowland, Long Beach, CA, for Howard N. Gilmore.

Charles D. Cummings, John E. Mackel, Sullivan Workman & Dee, Los Angeles, CA, for Thomsen Engineering Inc. and Nancy A. Gilmore.

Allyson S. Taketa, LeBoeuf Lamb Greene & MacRae, Los Angeles, CA, Michael R. Sullivan, Sullivan Law Corporation, Los Angeles, CA, for Aman Bros., Inc.

Edwin J. Gooze, Caplan & Gooze, Walnut, CA, for Triad Engineering, Inc.

## ORDER RE: MOTION FOR LEAVE TO AMEND; MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WILSON, District Judge.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

## I. Background

This case [1] arises out of alleged contamination of Plaintiff Nixon–Egli Equipment Co.'s ("Nixon–Egli") land as a result of grading and filling of the land by the Defendants. The property in question is a parcel in the City of Santa Fe Springs. From about 1920 to the 1960's, the parcel was one of many oil fields in the City and was used for producing crude oil. The owners of the parcel during the oil producing period are apparently dead. Def. JAA's Supp. P & A, p. 1. Defendants John A. Alexander Co. ("JAA"), John A. Alexander, and Howard and Nancy Gilmore purchased the parcel and adjoining parcels around 1970 as a joint venture. From 1970 to 1972, JAA, Alexander, and the Gilmores ("the Joint Venture") prepared the property in question for commercial development. They graded and filled the property as part of their grading and filling of all of the adjoining parcels. Defendants Aman Bros., Inc., Thomsen Engineering, and Triad Engineering were, respectively the grading contractor, civil engineer, and soils engineer.

From 1972 to 1977, Nixon–Egli leased the property from the Joint Venture. In 1977, Nixon–Egli purchased the property outright. From the time it first leased the property until present—some 25 years—Nixon–Egli has operated a heavy machinery cleaning and maintenance business on the property.

Nixon–Egli has made claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA," 42 U.S.C. § 9607(a)), the Resource Conservation and Recovery Act ("RCRA," 42 U.S.C. § 6972(a)(1)(B)), and the Hazardous Substance Account Act ("HSAA," Cal.Health & Safety Code § 25300, et seq.)— the California version of CERCLA—for clean-up of hazardous waste contamination. It has also brought common law claims for trespass, continuing nuisance, negligence, negligence per se, waste, and equitable indemnity.

## II. Analysis

### A. Motion for Leave to Amend

██ Plaintiff seeks leave to file its second amended complaint, adding a claim for fraud and a prayer for punitive damages, and dropping certain state law claims.[2] Were it not for the fact that the pending trial date had been vacated at an earlier hearing, the Court would not permit such a late amendment. However, since trial is still some time away and the discovery deadline has been vacated, Defendants will still be able to take any additional discovery required to defend on the new fraud and punitive damages issues. Moreover, it does not appear that the claims are proposed in bad faith or after any undue delay. According to the papers, the basis for the fraud claim was not confirmed until the Plaintiff received the confirmed copy of Hans C. Thomsen's deposition in June, 1996; contrary to Defendants' argument, the Court does not find that Plaintiff unreasonably delayed in taking this deposition. Rather, the deposition was scheduled in accordance with a mutually compatible discovery schedule amongst the parties. Thus, in accordance with F.R.Civ.P. 15's liberal allowance for amendment, the Court GRANTS the Plaintiff's Motion to File a Second Amended Complaint.

### B. Motion for Partial Summary Judgment re: RCRA

#### 1. RCRA 90 Day Notice & Wait Provision

Plaintiff alleges that Defendants are liable under RCRA for the cost of cleaning-up the property. Defendants the Gilmores, Amman Bros., and Thomsen Engineering previously filed and/or joined a Motion for Partial Summary Judgment on the RCRA claim. The motion argued that the RCRA claim must be dismissed against all Defendants save JAA due to lack of proper pre-filing notice under 42 U.S.C. § 6972(b)(2)(A). At the hearing on the motion, Plaintiff stipulated to dismissing the RCRA claim against all Defendants save

---

**1.** This case was originally assigned to U.S. District Judge Edward Rafeedie and was transferred to this Court when Judge Rafeedie recused himself due to a conflict with Plaintiff's counsel.

**2.** Plaintiff wants to drop the state law claims for negligence, negligence per se, waste, and equitable indemnity.

JAA so that Plaintiff could serve the proper notice, wait the required 90 days, and file an amended complaint adding the properly served Defendants to the RCRA claim. Therefore, the Court ORDERS that the RCRA claims against Defendants the Gilmores, Amman Bros., Thomsen Engineering, and Triad Engineering are DISMISSED without prejudice.

### 2. RCRA "Substantial Endangerment" Question

■ In its reply in the Motion for Partial Summary Judgment re: CERCLA Petroleum Exclusion, (discussed below) JAA also mentions a potentially fatal weakness in the Plaintiff's RCRA claim. JAA argued that Plaintiff's own evidence shows that the contamination does not pose a "substantial endangerment to health or the environment," a required element of a RCRA cause of action. Since this was only mentioned in a footnote in a reply, (Def. JAA's Reply P & A, p. 16, n. 7) it is not a proper part of any motion for summary judgment, but may be raised in a future motion.

### 3. RCRA Statute of Limitations

Defendant JAA claims that the RCRA claim is barred under the applicable statute of limitations. The parties agree that the claim is brought under § 7002 of RCRA (42 U.S.C. § 6972(a)(1)(B)). The parties also agree that RCRA itself does not provide a statute of limitations for such actions.

The question of what, if any, statute of limitations applies to RCRA actions is surprisingly unanswered. Generally, in situations where a federal statute provides no statute of limitations, courts apply the "relevant" federal or state statute of limitations. *Del Costello v. International Brh. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). With regard to RCRA, the debate about what statute of limitations should apply is inextricably tied to the question of what causes of action are available under RCRA.

In *KFC Western v. Meghrig*, 49 F.3d 518 (9th Cir.1985), the Ninth Circuit addressed the question of whether RCRA provided a cause of action for recovery of clean-up costs

expended in the past. The defendants argued that RCRA did not provide for such a cause of action since the language of the statute referred to situations which "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) The defendants argued that the language clearly referred to currently existing threats, not those which had already been remedied. Thus, they argued, RCRA could not be used to recover costs for cleaning up waste which may have presented a threat in the past but which was currently benign. As evidence of the forward looking nature of RCRA causes of action, the defendants pointed to the lack of a statute of limitations. They argued that since RCRA had no statute of limitations, allowing causes of action based on past clean-ups would essentially permit a landowner to perform a clean-up and then come after other RCRA parties at any time for contribution.

The Ninth Circuit acknowledged that the language of RCRA seemed to focus on present threats. Nevertheless, the court held that RCRA, like its cousin CERCLA, did provide for cost recovery for past clean-ups. In so holding, it did not *disagree* with the defendant's argument that there was no statute of limitations for RCRA actions. Rather, it reasoned that, even if there were no statute of limitations, the doctrine of laches would still be available to protect potential RCRA Defendants from being sandbagged for costs down the road.

The Supreme Court granted *certiorari* in *Meghrig*. However, before the case was heard in the Supreme Court, the District of Oregon addressed the statute of limitations problem. In *Catellus Development Corp. v. L.D. McFarland Co.*, 910 F.Supp. 1509 (D.Or.1995), the court held that *Meghrig's* concession that there was no statute of limitations for RCRA actions was mere *dicta*. *Catellus* then went on to look for a "relevant" statute of limitations to apply. In so doing, it assumed that *Meghrig* was correct in its conclusion that RCRA was like CERCLA and that RCRA permitted post-cleanup cost recovery. Thus, *Catellus* concluded that the

most "relevant" statute of limitations was that used in CERCLA cost-recovery actions.[3]

In so holding, *Catellus* correctly rejected the theory adopted by other courts that the applicable statute of limitations was that found in 28 U.S.C. § 2462. *See Glazer v. American Ecology Environmental Services*, 894 F.Supp. 1029 (E.D.Tex.1995); *Bodne v. Geo. A. Rheman Co., Inc.*, 811 F.Supp. 218 (D.S.C.1993). Section 2462 provides the statute of limitations for actions "for the enforcement of any civil fine, penalty, or forfeiture ..." where a federal statute does not otherwise provide a limitations period. This section has been used in the past in connection with other environmental statutes such as the Clean Air Act. *See United States v. Walsh*, 8 F.3d 659 (9th Cir.1993). However, cases such as *Glazer* and *Bodne* make no persuasive argument for applying § 2462 to RCRA claims. Rather, the cases simply note that § 2462 has been used in many "environmental" citizen suits; they do not examine the procedural and policy distinctions between RCRA and other federal environmental statutes such as the Clean Air and Clean Water Acts.

■ The Court finds that, with the exception of a RCRA suit seeking civil penalties, the line of cases applying § 2462 to RCRA citizen suits is wrong. As the court observed in *Catellus*, unlike suits for penalties under the Clean Air Act, a RCRA action only seeking an order to compel other parties to help with clean-up is not akin to an action seeking a civil fine or penalty. The present RCRA action does not seek civil penalties. *Cf. U.S. v. Walsh*, 8 F.3d 659 (9th Cir.1993) (§ 2462 applicable to claims for civil penalties under the Clean Air Act.) Thus, the Court rejects Defendant's argument that § 2462 limits the time within which Plaintiff's action can be brought.

■ The Court, however, disagrees with *Catellus'* conclusion that CERCLA provides the applicable statute of limitations for RCRA actions. In light of the Supreme Court's reversal of the Ninth Circuit's decision in *Meghrig, Catellus's* reliance on the CERCLA statute of limitations is unsupported.

On appeal, the Supreme Court reversed the Ninth Circuit in a unanimous decision. *Meghrig v. KFC Western, Inc.*, —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). The Court held that RCRA only allowed a landowner to seek relief for present "imminent and substantial" threats to health and/or the environment. Thus, contrary to *Catellus'* assumptions, it is not correct to say that RCRA is a "cost recovery" statute like CERCLA. The Supreme Court buttressed this conclusion by noting the differences between RCRA and CERCLA. First, the Court noted that the "national policy behind RCRA is to minimize the present and future threat to human health and the environment." *Id.* at ——, 116 S.Ct. at 1255. In contrast, CERCLA was passed a few years after RCRA and explicitly permits the government to recover "all costs of removal or remedial action." *Id.* "Congress thus demonstrated that it knew how to provide for the recovery of clean-up costs, and that the language used to define the remedies under RCRA does not provide that remedy." *Id.* The Court also noted that whereas under RCRA a party could be forced to help with a cleanup no matter what the costs, CERCLA, which allows a problem to be reviewed in hindsight, only permits recovery of "reasonable" costs. Again, this distinction seems to highlight the difference between RCRA's "immediate action" stance and CERCLA's more traditional tort liability stance. Finally, the Court noted that, unlike CERCLA, RCRA has no statute of limitations. In the Court's view, Congress would not have passed a law permitting recovery of past clean-up costs without providing a statute of limitations. *Id.*

Although the Supreme Court did not specifically hold in *Meghrig* that there is no statute of limitations applicable to a RCRA cause of action, it did eviscerate the assumption underlying *Catellus'* approach—the assumption that RCRA and CERCLA are closely analogous causes of action. The thrust of the Supreme Court's analysis is

---

**3.** Under CERCLA § 113, a claim for costs can be brought within three years of removal of the contaminants or within six years of the initiation of any remedial actions.

that RCRA was designed to deal with actual and immediate threats to the environment and that, after a few years, Congress revisited the situation to permit landowners to "spread" the costs of such clean-ups in accordance with more traditional tort theories. Against this background, it is improper to lump CERCLA and RCRA together as in *Catellus*. Therefore, the Court cannot turn to CERCLA to provide the statute of limitations for RCRA causes of action.

In both the Ninth Circuit and Supreme Court opinions in *Meghrig*, the observation that RCRA does not contain a statute of limitations was *dicta* invoked in support of a conclusion about the nature of a RCRA claim. Nevertheless, the *dicta* in the Supreme Court's opinion is fairly strong and was an important factor supporting the Court's conclusion. In addition, given the Supreme Court's decision that RCRA only comes into play if there is a present danger, it is likely that Congress did not intend for courts to apply any statute of limitations to such actions. At most, the defense of laches could be raised in a situation where an imminent threat has existed for a substantial period of time, but the landowner has sat on the claim. Indeed, laches fits perfectly with the Supreme Court's analysis of RCRA as a statute which essentially provides prospective equitable relief in the form of an injunction and/or declaratory relief. Therefore, the Court concludes that there is no statute of limitations applicable to RCRA causes of action which do not seek civil penalties and that the most likely defense would be laches. In this case, Defendant has not raised a laches defense. Accordingly, the Court DENIES Defendant JAA's motion for partial summary judgment on the RCRA claim.

## C. Motion for Partial Summary Judgment re: CERCLA Petroleum Exception

Plaintiff is suing Defendants under CERCLA and HSAA, its California counterpart.

Both CERCLA and HSAA impose liability for the cost to clean up contamination caused by the "release ... of a hazardous substance." 42 U.S.C. § 9607(a); Cal. Health & Safety Code § 25323.5.[4] However, both statutes exclude "petroleum, including crude oil or any fraction thereof" from the definition of "hazardous substance." 42 U.S.C. § 9601(14); Cal. Health & Safety Code § 25317. Defendants have brought this motion for partial summary judgment on the CERCLA and HSAA claims, arguing that any contamination at the site is not actionable because of the so-called "petroleum exclusion."[5]

The parties' respective burdens on summary judgment are inextricably tied to their burdens of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has the burden on an issue, it must show that there is no genuine issue of material fact in the record and that, on the basis of the undisputed facts, it is entitled to judgment as a matter of law. *Celotex* at 331–32, 106 S.Ct. at 2557 (Brennan, J. dissenting) (restating summary judgment burdens for situations not addressed by the majority opinion); *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir. 1995). The opposing party need only raise a genuine issue of material fact to defeat the motion in such a case. Conversely, where the burden of proof on an issue would ultimately lie with the non-moving party, the moving party only needs to point to a lack of evidence supporting the non-moving party's burden. The non-moving party then has the burden to point to evidence from which a reasonable jury could conclude that she has met her burden of proof. *Celotex* at 325–27, 106 S.Ct. at 2554.

The primary source for interpreting a statute is the text of the statute itself. *Vice-*

---

4. Four elements must be shown in order to impose for liability under CERCLA and HSAA: 1) the site at issue is a "facility;" 2) there has been a release of a hazardous substance; 3) the party is among the four classes of response parties; and 4) response costs have been incurred. 42 U.S.C. § 9607(a); Cal. Health & Safety Code § 25363(e).

5. The Order will only discuss cases interpreting CERCLA since it is well-established that the HSAA is interpreted consistent with CERCLA. *KFC Western, Inc. v. Meghrig*, 23 Cal.App.4th 1167, 1174–77, 28 Cal.Rptr.2d 676 (1994).

roy Gold Corp. v. Aubry, 75 F.3d 482 (9th Cir.1996). CERCLA liability is contingent on finding release of a "hazardous substance." S. Pac. Transp. Co. v. California (Caltrans), 790 F.Supp. 983, 987 (C.D.Cal. 1991). Under 42 U.S.C. § 9601(14), the term "hazardous substance" includes many substances listed in other parts of Titles 33 and 42, but "does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance...." This is the "petroleum exclusion."

Courts have interpreted the exclusion to preclude liability for otherwise hazardous substances which are contained in and are indigenous to petroleum or are added as a constituent during the refining process. For example, even though lead is generally a hazardous substance under § 9601(14), if the source of the lead on a property is petroleum and that lead is the lead which was indigenous to the petroleum, or lead added to the petroleum when it was refined into gasoline, that lead is not a "hazardous substance" for purposes of CERCLA liability. Wilshire Westwood Assoc. v. Atlantic Richfield, 881 F.2d 801, 805 (9th Cir.1989) However, if the hazardous substance found came from petroleum but was not indigenous to the petroleum or added during a refining process, then the hazardous substance is a basis for CERCLA liability. Thus, lead which is leached from a petroleum storage tank would be a hazardous substance. Id. Likewise, substances added to waste oil during disposal or to used oil through use (such as PCB's added during use in a transformer) are not excluded and can be hazardous substances under CERCLA. 50 Fed.Reg. 13460 (April 4, 1985) (EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exception); Mid Valley Bank v. North Valley Bank, 764 F.Supp. 1377, 1384 (E.D.Cal.1991) (exclusion does not apply to lead added to waste oil); U.S. v. Mexico Feed and Seed Co., Inc., 729 F.Supp. 1250 (E.D.Mo.1990) (CERCLA liability imposed for tanks containing waste oil contaminated with PCBs). Finally, the exclusion also applies even if the contamination at a particular site is caused by moving in petroleum tainted soil from somewhere else. See Southern Pacific Transportation Co. v. California (Caltrans), 790 F.Supp. 983, 986–87 (C.D.Cal. 1991).

Because the so-called "petroleum exclusion" is actually found within the section defining "hazardous substance" (42 U.S.C. § 9601(14)) and not in the section setting forth various affirmative defenses, (§ 9607(b)) there is considerable ambiguity as to which party has the burden to prove or disprove the applicability of the exclusion. On the one hand, it could be argued that since the plaintiff always has the burden of showing that there is a "hazardous substance" and the exclusion is part of the definition of "hazardous substance," the Plaintiff bears the burden of disproving the applicability of the exclusion whenever the Defendant raises it. In other words, since the definition of hazardous substance includes a negative—no petroleum—Defendants argue that Plaintiffs must negate the negative in order to fulfill their burden of proving release of a hazardous substance.

There is no case authority to support this argument. Rather, all of the cases agree that the exclusion is more like an affirmative defense. see Ekotek Site PRP Committee v. Self, 932 F.Supp. 1319, 1323–24 (Utah 1996) (Defendant bears burden of proving applicability of petroleum exception); Foster v. United States, 926 F.Supp. 199 (D.D.C.1996) (same); also see Dartron Corp. v. Uniroyal Chemical Co., Inc., 917 F.Supp. 1173, 1183–83 (Defendant bears burden of proving that used oil was uncontaminated and falls within the petroleum exception where it is undisputed that used oil had been stored in a tank and spilled on ground).

In Ekotek, the court recognized that the petroleum exclusion was not, strictly speaking, an affirmative defense. Instead, the court reasoned that the best way to characterize the petroleum exclusion was as a "statutory exception." Ekotek, 932 F.Supp. at 1322–23. Ekotek characterized a "statutory exception" as a situation which would otherwise fall within the proscription of a statute but, for policy reasons, is not implicated by the statute. Id. The Court then went on to

conclude that the petroleum exclusion is a statutory exception and, as is the case with other statutory exceptions, that the party seeking to invoke the exception bears the burden of proof on it applicability. *Id.* (citing *United States v. First City Nat'l Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (general rule that party seeking benefits of an exception bears the burden of proof on the applicability of the exception) and *United States v. Fleet Factors Corp.,* 901 F.2d 1550 (11th Cir.1990) (party seeking to invoke non-participation exception to CERCLA definition of "owner or operator" bears burden of proof as to the exception)).

 The Court is persuaded that it is correct to characterize the petroleum exclusion as a statutory exception. As the court found in *Ekotek,* the exclusion is probably not, technically, an affirmative defense.[6] However, the exclusion is a statutory exception in that it makes petroleum-based contamination nonactionable for policy reasons even though such contamination might otherwise be actionable under CERCLA's general definition of "hazardous material." The Court is also persuaded by the Eleventh's Circuit's conclusion in *Fleet Factors* regarding the "non-participation" exception to CERCLA's definition of "owner or operator" since the statutory language and structure setting forth the petroleum exclusion is almost exactly like that setting forth the exclusion at issue in *Fleet Factors.* The Ninth Circuit has agreed that the burden of proof on statutory exceptions falls on the party seeking to reap the benefits of the exception. *See EEOC v. Kamehameha Schools/Bishop Estate,* 990 F.2d 458, 459 (9th Cir.1993). Accordingly, the Court finds that Defendants

bear the burden of proof on the applicability of the petroleum exception.

To show that the petroleum exclusion applies, Defendants rely primarily on statements by Plaintiff's experts and consultant that the source of the "contamination" is "crude oil." Lambie Depo., Supp. Casey Decl., Ex. B (metals found on site were associated with crude oil or indigenous to soil); Environ Report, Casey Decl., Ex. B (source of contamination believed to be crude oil); Woodward Clyde Consulting Report, Casey Decl., Ex. D (probable source of contamination was prior petroleum production); Stechman Depo., Casey Decl., Ex. B, p. 174:5–8 (source of contamination was crude oil). The parties have made numerous arguments as to why this evidence is or is not sufficient to carry Defendants' burden and what other evidence in the record refutes this conclusion. However, so long as one argument raises a genuine issue, exploring the merits of the remaining arguments would be futile. Therefore, the Court will focus only on the dispositive argument.

 Plaintiff relies on the testimony of Dr. Isaac Kaplan for the inference that there is more than one source for the contamination found in the soil on the property and that the lead—the alleged hazardous material—is not solely from crude oil. In his analysis of the reports and examinations made by other consultants, Kaplan concluded that the levels of lead on the property exceeded that which would be found naturally in crude oil and that the lead "seemed that it may be an additive." Kaplan Depo., Second Taggart Decl., Ex. H, p. 49:4–7. He speculated on the possible sources for the lead—equipment, piping, drilling by-products,[7] crude oil itself,

---

6. The fact that the petroleum exclusion is not in the section of CERCLA listing "affirmative defenses" is not necessarily conclusive as to the proper characterization of the exclusion since courts have noted that CERCLA was not a particularly well-drafted law and the statutory language lends itself to ambiguities. *see U.S. v. Fleet Factors Corp.,* 901 F.2d 1550, 1554, n. 3 (11th Cir.1990); *Coastal Casting Service v. Aron,* 1988 WL 35012 (S.D.Tex. April 8, 1988); *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573 (D.Md.1986).

7. Defendants spend a good deal of time arguing that drilling by-products other than tank-bottoms fall within the petroleum exclusion. The Court rejects this contention. In *Cose v. Getty Oil,* 4 F.3d 700 (9th Cir.1993), the Ninth Circuit held that "tank bottoms" did not fall within the petroleum exclusion. Tank bottoms are the sediment and liquid which settles to the bottom of a crude oil storage tank; it settles out by gravity. The bottoms are siphoned off before and the crude oil is then shipped to a refinery. The bottoms were often thrown into sumps.

The Ninth Circuit held that these bottoms were not petroleum because they were never part of

and possibly even leaded gasoline emissions from cars before unleaded gasoline became standard. *Id.* at 49:17–25; 50:1–10.

Defendants counter that Kaplan concluded that the source of the contamination on the property was "weathered crude oil." Kaplan Report, Second Casey Decl., Ex. B, p. 3. This is true; however, that was only his conclusion as to the source of the *hydrocarbon* contamination. *Id.* In other words, Kaplan agreed that there was oil in the property and that that's where the hydrocarbons came from, but that conclusion is not inconsistent with his testimony that the lead came from a source other than crude oil.

█ Thus, there is a genuine issue of material fact as to the source of the lead on the property. If the lead was from the crude oil, it would fall within the exclusion and would not be a hazardous substance under CERCLA. However, if the lead is not from a petroleum source, it is a hazardous substance and can form the basis for CERCLA liability.[8]

## D. Motion for Partial Summary Judgment re: Damages from Subsidence

Plaintiff does not claim that there has ever been subsidence of the property during the twenty-five years it has occupied the land. However, Plaintiff has recently learned that the land fill used by the developers to grade the property was allegedly not cleaned of all

"deleterious" substances. The fill allegedly contains materials such as wood and rubber which could deteriorate over time. Such deterioration would allegedly leave holes in the fill which could then collapse, causing subsidence of the property. Plaintiff plans to seek damages for such future subsidence under its state law nuisance and/or trespass causes of action. Defendants are seeking partial summary judgment on the issue of future subsidence damages.

Defendant Alexander makes four attacks on Nixon–Egli's claim for damages for future subsidence: 1) the claim was never adequately pled, 2) the claim should be barred for failure to comply with Rule 26 requirements, 3) the claim is barred by the statute of limitations, and 4) the claim is too speculative.

### 1. Failure to Plead Subsidence

In its First Amended Complaint, (FAC) Nixon–Egli does not mention the word "subsidence." Rather, the complaint focuses on alleged contamination of the property and related clean-up costs. Defendants claim that they only became aware that Plaintiff would ask for damages for possible future subsidence when they received an expert report discussing the danger of subsidence due to the alleged contamination of the fill with "deleterious" substances. Def. JAA's P & A's re: Motion for Partial Summary Judgment, pp. 1 & 4. That report was received

---

the crude oil sent on to the refinement process. Even though the bottoms were made up of materials which had been part of the crude oil when it was pumped out of the ground, and the exclusion provision in the statute refers to "fractions" of crude oil, the court concluded that such materials did not fall within the exclusion because they were not part of the crude oil shipped for refinement.

*Cose*'s reasoning compels the conclusion that drilling by-products such as the ground soil ("cuttings") and mud used to lubricate the drill ("drilling muds"), would not fall within the petroleum exclusion. Like the tank bottoms in *Cose*, cuttings and muds are never sent for refinement. Moreover, whereas there was a strong argument in *Cose* that tank bottoms were "fractions" of crude oil and thus within the exclusion, one cannot argue that cuttings and muds are "fractions" crude oil. Cuttings are the rock containing the crude oil, not vice versa, and muds are thrown down with the drill, so they cannot be part of the crude oil. Thus, to the extent that

the lead could have come from cuttings or muds or other by-products, the lead would fall outside the petroleum exclusion.

**8.** At hearing, Defendants argued that there is undisputed evidence that the petroleum contamination can be separated out from the lead and other heavy metal contamination and that the lead and other heavy metals on the site does not need to be cleaned up under CERCLA. In sum, Defendant argued that, to the extent that any contamination was from petroleum, it fell within the exclusion and did not have to be cleaned up and, to the extent that the lead and other heavy metal fell outside the exclusion because they were from other source, they did not require clean-up under CERCLA. This issue was also alluded to in the papers. However, in the Court's view, this argument was never fully developed and thus cannot form the basis for summary judgment for the Defendant at this time.

by Defendants on May 22, 1996. Defendants essentially claim that they have been sand-bagged on the issue because their discovery and pretrial preparations have focused on the hazardous waste contamination theory.

 Plaintiffs respond that the FAC *does* refer to the presence of deleterious substances in its allegations for nuisance and trespass. This is true. And under the liberal pleading rules, such broad allegations would generally be enough to put a party on notice for all possible claims for damages flowing from the alleged nuisance and trespass. However, Plaintiff has boxed itself in. The complaint goes beyond broad allegations and, in so doing, limits its nuisance and trespass claims to damages due to contamination, not subsidence.

For example, ¶ 60 of the FAC limits "the nuisance" at issue to the alleged contamination; it states:

> Nixon–Egli is informed and believes that *the nuisance* is continuing in that *contaminants continue to be released* from the fill placed by the defendants *and continue to migrate deeper* into the native soil beneath the fill, the impact of these conditions varies over time, and these conditions can be abated at a reasonable costs and within a reasonable period of time. *see also* ¶ 69 re: claim for Public Nuisance.

Likewise, ¶ 77–78 refer to the "trespass" as the "releases and discharges" on the property. Words such as release and discharge conjure up images of hazardous waste flowing into, through, and out of the property. They do not refer to a danger created when and if wood and rubber disintegrate and leave a hole in the fill beneath a building. Thus, the complaint *does not* put a party on notice that there is a claim for nuisance or trespass arising out of the possibility of future subsidence due to the presence of decaying material in the fill used on the property. Therefore, to the extent that there is any claim for nuisance or trespass based on the possibility of future subsidence, it is DISMISSED.

### 2. Discovery Violations

Defendants also argue that the Court should strike the report by Nixon–Egli's expert Lawrence Rogoway who would support the future subsidence theory. Defendants claim that the expert's report was deficient under Rule 26 because it did not contain the data or other information which formed the basis for his opinion regarding subsidence. Alternatively, Defendants argue that in response to an interrogatory requesting Plaintiff to "identify each item of damage which you seek to recover from JAA in this lawsuit," Plaintiff never mentioned future subsidence. Therefore, Defendants argue, testimony on the issue should be precluded as a discovery sanction.

 In his report, the expert does explain the basis for his opinion; he refers to the reports he has read and summarizes the physical theory of how the inclusion of deleterious substances in the fill can lead to subsidence. Rogoway Report, Casey Decl., Ex. A. Thus, the report is adequate under Rule 26. In addition, the answer to the interrogatory does, arguably, leave open the door for damages due to future subsidence. The supplemental answer to the interrogatory includes "any and all costs to ... otherwise abate the nuisance existing on the real property...." Ex. C. to Casey Decl., 47–48. Moreover, as Plaintiff points out, Defendants suffered no prejudice from any ambiguity in the answer in light of the deposition of Stechman in which JAA's counsel inquired into Stechman's opinion regarding "soil stability" after Stechman discussed the potential for materials in the fill to decay and leave voids. Taggart Decl., Ex. G, pp. 147–49. Thus, the Court DENIES the motion for summary judgment on this ground. The Court also notes that the real dispute appears to be whether Plaintiff's expert was entitled to form the opinion he did from the reports alone without conducting his own testing. This may be the basis for a *Daubert* motion. *See* Section E below.

### 3. Statute of Limitations

There is substantial debate about whether Plaintiff's claim, although couched as a continuing nuisance claim, should really be gov-

erned by the statute of limitations for construction defects. An action for a continuing nuisance can only be brought for damages from the nuisance occurring within the three years preceding the complaint. An action for damages due to a construction defect, on the other hand, must be brought within 10 years of the defective construction. In addition, a party who possessed the disputed property at the time of the alleged defect is barred from ever asserting the 10 year statute. Cal. Civ.Proc. § 337.15(e).

■■ Defendant argues that the Plaintiff's claim is barred either way. First, it argues that the applicable statute is the 10 year construction defect statute. Since more than 10 years has passed since the allegedly defective grading was done, Defendant argues that the claim is barred. Plaintiff, correctly, responds that Defendant cannot raise the 10 year statute since it was an owner of the property at the time of the alleged defect.

Defendant's response is illogical; they argue that they were both an owner and a general contractor at the time the allegedly defective work was done. This alleged dual status is irrelevant. Even if JAA were also liable as a general contractor and could assert the 10 year statute, they do not dispute that they would still be liable as an owner and could not raise the statute as a defense to such liability. Thus, the fact that JAA may be able to escape liability as a general contractor does not immunize them from liability as an owner.

Defendant also argues that the three year continuing nuisance statute is inapplicable. This appears to be correct under California law. *Chevron v. Superior Court*, 36 Cal. Rptr.2d 783 (1994) (in actions arguably falling within both 10 year construction defect statute and 3 year reach for continuing nuisance, courts should apply the 10 year statute). This argument backfires however; even if it were a valid argument, it would still leave Defendant liable as an owner under the 10 year statute as discussed above. Therefore, the Court DENIES the motion for partial summary judgment on this ground.

### 4. Claim is Too Speculative

■■ Defendants also argue that there is insufficient evidence to support the claim for future subsidence. In tort actions, damages—especially prospective damages—cannot be speculative. This means that there must be evidence to support both the fact of future damages as well as the amount of such damages. To establish the fact of future damages, there must be evidence that a reasonable probability exists that harm will occur in the future. Here, there is sufficient evidence to create a genuine issue of material fact as to possible future harm. The Plaintiff's expert stated in his report that there was a "strong likelihood" of future subsidence. "Strong likelihood" is nearly synonymous with "reasonable probability."

The problem seems to be a lack of evidence to support the amount of damages. "Summary judgement is appropriate where [plaintiff has] no expert witness or designated documents providing competent evidence from which a jury could fairly estimate damages." *McGlinchy v. Shell Chemical Company*, 845 F.2d 802, 808 (9th Cir.1988). As Defendant points out, Plaintiff's expert only provides evidence regarding the existence of future injury, not the extent or amount of damages due to such injury. In fact, he does not even quantify the risk such that one could attempt to discount the property value by the risk of future subsidence. Plaintiffs do not point to any other evidence regarding damages for future subsidence. Thus, even though the amount of prospective damages need not be proven with exactitude, the claim cannot go forward since to do so would invite the jury to engage in wholesale speculation as to the amount of damages. Accordingly, the Court also GRANTS the motion for summary judgment on the subsidence damages claim on this ground.

### E. Possible *Daubert* Motions re: Expert Witnesses

■■ The resolution of many of the issues in this case are obviously contingent on testimony from expert witnesses. Throughout the papers on these motions, there have been veiled references to the competency of experts offered from both sides. However, nei-

ther side has explicitly attempted to exclude any expert testimony under the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As the Ninth Circuit has recently made clear, the *Daubert* standard can be invoked at the summary judgment stage as well as at trial or in motions *in limine*. *See Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594 (1996) (pre-trial *Daubert* motion dispositive on motion for summary judgment). In the Court's experience, a well-reasoned *Daubert* motion can be dispositive in cases such as the one at bar; at the very least, such motions can limit the issues for trial. The Court invites both sides to make any appropriate *Daubert* motions.

*III. Conclusions*

1. The Motion for Leave to Amend to add the fraud claim and prayer for punitive damages and to drop the negligence and negligence *per se* claims is GRANTED.

2. The RCRA claims against all Defendants except JAA are DISMISSED without prejudice.

3. The Motion for Partial Summary Judgment on the RCRA claim against JAA is DENIED.

4. The Motion for Partial Summary Judgment on the CERCLA claims is DENIED.

5. The Motion for Partial Summary Judgment on the claim for Damages Due to Future Subsidence is GRANTED.

IT IS SO ORDERED.